The document below is hereby signed.

Signed: March 28, 2013



*S. Martin Teel Jr.*

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CONGRESS 819, LLC, | ) | Case No. 12-00300 |
| | ) | (Chapter 11) |
| Debtor. | ) | **Not for Publication in** |
| | ) | **West's Bankruptcy Reporter** |

MEMORANDUM DECISION RE MOTION
FOR RELIEF FROM AUTOMATIC STAY AND OTHER RELIEF

PNC Bank, N.A. holds a claim for amounts advanced under a
lending agreement with the debtor, Congress 819, LLC, and secured
by a deed of trust against real property located at 1109-1115
Congress Street, N.E., Washington, D.C.  It seeks relief from the
automatic stay to proceed with a foreclosure sale, and, in the
alternative, adequate protection payments.  The court will grant
relief from the automatic stay.

PNC contends that relief from the stay is appropriate under
11 U.S.C. § 362(d)(2) because there is no equity in the property
and that it is unnecessary for an effective reorganization.  PNC
alternatively contends that relief from the stay, or a
requirement of adequate protection payments, is appropriate under
11 U.S.C. § 362(d)(1) for cause because the debtor has not been

making any payments, including failing to pay taxes on the
property.[1]

The debtor opposes PNC's motion, contending that it has
substantial claims against PNC for failing to fund its ninth draw
request under the lending agreement, and that those claims
substantially reduce PNC's claim. Based on its claims against
PNC, the debtor asserts that there is equity in the property;
that the equity adequately protects PNC; and that the property is
necessary for an effective reorganization.

I

On February 29, 2008, PNC entered into an agreement with the
debtor to lend the debtor moneys to purchase the Congress Street
property, which included a two-story building, and to fund
various demolition and other construction work to expand the
building to three stories and to convert it from an industrial
warehouse to commercial office space. PNC obtained a deed of
trust on the property to secure amounts advanced pursuant to the
lending agreement.

Pursuant to the lending agreement, PNC advanced the funds

---

[1] PNC also sought relief under 11 U.S.C. § 362(d)(3), but
that request was premature because the court had not yet
determined that the debtor is subject to § 362(d)(3). That
determination has now been made, and will trigger certain
obligations for the debtor to meet, within 30 days after entry of
that order, if it is to be entitled to defeat a renewed request
for relief under § 362(d)(3) filed after the passage of that 30
days.

for the debtor to purchase the Congress Street property, and later funded the debtor's first eight draw requests for funds to expand and convert the property to commercial office space. In September 2009, PNC declined to honor the debtor's ninth draw request.  More about that later.

The debtor has made no payments to PNC since June 30, 2010. The debtor commenced this case on April 24, 2012.  The current amount owed to PNC as of March 7, 2013, was $3,115,054.34 (before any setoff for the amount of any claim by the debtor against PNC).  Interest on the PNC obligation accrues at $500 per day and late fees continue to accrue as well.

I will address PNC's request for relief under § 362(d)(2) before turning to PNC's request for relief under § 362(d)(1).

II

If one disregards the debtor's claims against PNC, it is obvious that relief from the automatic stay is appropriate under § 362(d)(2).

A

With respect to the issue of whether the property has any equity, PNC bears the burden of proof under 11 U.S.C. § 362(g), and it has carried that burden if one puts aside the question of the debtor's claims against PNC that might reduce the amount owed PNC.  The debtor has a contract to sell the property, but that contract would yield insufficient funds to pay PNC in full.

3

PNC's expert, Thomas J. Shields, valued the property in its as-is condition as of June 11, 2012, as worth $1,900,000, and he does not believe that market conditions since then have had any significant impact on the value of the property.  His appraisal was based on there being no leases of the property in June of 2012.  As of October 8, 2010, Shields had valued the property at $3,400,000 in its as-is condition based on existing agreements, or letters of intent, to lease 83% of the building's space upon a projected completion date of April 2011 as follows:

- 3,000 square feet pre-leased at $37.00 per square foot triple net;

- 1,000 square feet pre-leased at $36 per square foot;

- 6,000 square feet being the subject of a letter of intent for a triple net lease at $37.00 per square foot; and

- 2,000 square feet being the subject of a letter of intent for a triple net lease at $33.50 per square foot.

Those leases and letters of intent fell through when the debtor was unable to obtain funds to complete construction.

On January 26, 2013, the debtor entered into a contract to sell the property to Michael Lester for $3,200,000, but the

contract includes a "Feasibility Period" ending March 26, 2013,[2] during which Lester could back out of the contract.  Lester has not yet made the $50,000 deposit required by the contract.  Lester has sought a $2.4 million loan from Monument Bank, and, if he obtains that loan, has the resources to fund the balance of the purchase price.  He has seen a $3.2 million appraisal of the property given to Monument Bank.  Monument Bank has given Lester a term sheet but not a loan commitment.  The sale could close no sooner than approximately May 6, 2013.

Currently, the property is not pre-leased by the debtor or by Lester as a prospective purchaser, but Lester has obtained a letter of intent from one prospective lessee who would rent a minimum of 7,000 square feet of the building's 13,298 square feet of space at $33 per square foot triple net (and would be willing to rent the entire space).

Lester's contract to purchase is really an option to purchase.  If his loan does not come through or the entity that has given him a letter of intent were to get cold feet, Lester could back out of the contract before the expiration of the Feasibility Period.  His expression of a current willingness to complete the sale necessarily is made with the knowledge that he has time to solidify the letter of intent into an actual lease of

---

[2]  The original "Feasibility Period" has been extended by agreement to that date.

5

part of the property, and to back out of the deal if he cannot
achieve an actual lease.  Accordingly, it is inappropriate to
value the property at $3,200,000, the amount of the Lester
contract.  In valuing the property, substantial weight must be
given to Shields' appraisal of the property as worth only
$1,900,000.  Although some weight might be given to the Lester
contract, and to the letter of intent Lester has in hand, the
property must still be valued at far less than the debt owed the
bank of $3,115,054.34 (the amount owed as of March 7, 2013,
before any setoff for the amount of any claim by the debtor
against PNC).

Even if one were to view the value of the property as
$3,200,000 (the purchase price under the Lester contract) there
is no equity in the property.  This follows because the amount
that could be obtained from a sale of the property must take into
account closing costs, accruals of charges against the property
pending completion of the sale, and PNC's attorney's fees in
enforcing the deed of trust.  Section 10(c) & (d) of the *Real
Estate Purchase Agreement* between the debtor and Lester calls for
real estate taxes to be adjusted at the closing date, for the
debtor to pay a reasonable settlement fee, and for the debtor to
pay one-half of all transfer and recordation taxes.  The transfer

and recordation taxes will aggregate 2.9% of the $3,200,000,[3] and
the debtor's one-half of those charges would total $46,400.  The
real estate taxes that will have accrued as of May 6, 2013, would
total $15,035.22.[4]  So the debtor's share of transfer and
recordation taxes, and the debtor's share of real estate taxes
would reduce the $3,200,000 to net proceeds of $3,138,564.80, and
the debtor's payment of a reasonable settlement fee would reduce
the net proceeds to even less.  Interest of $30,000 will have
accrued, bringing the debt to more than $3,145,054, even without
taking into account attorney's fees and the amount of a
reasonable settlement fee.  Accordingly, if the $3,200,000
contract were to close, the debtor's share of closing costs would
result in the debtor's netting no more than $3,138,564.80, which

---

[3]  A sale for $3.2 million would result in a 1.45%
recordation tax.  *See* D.C. Code § 42-1103(a)(1) (imposing a 1.1%
tax) and § 42-1103(a-4) (imposing an additional .35% tax for
transfers after October 1, 2006, for a consideration in excess of
$400,000).  A sale for $3.2 million would result in a transfer
tax of 1.45%.  *See* D.C. Code § 47-903(a)(1) (imposing a 1.1% tax)
and § 47-903(a-4) (imposing an additional tax of .35%).

[4]  According to an appraisal in evidence, the real estate
tax for the tax year 2013 (running from October 1, 2012, through
September 30, 2013) is $21,875 based on the proposed assessment
of the property of $1,325,780 (a value less than any value placed
on the property by the parties).  In addition, the property is
subject to a business improvement district tax of $3,241.05,
bringing the total to $25,116.05.  One-half the tax year 2013
real estate taxes is due on March 31, 2013, and the other half
due on September 15, 2013.  As of March 31, 2013, $12,558.02 will
have come due (the one half due on March 31, 2013), and from
April 1, 2013, to May 6, 2013, an additional $2,477.20 (36/365ths
of $25,116.05) will have accrued, for a total of $15,035.22.

7

is less than the amount that will be owed on the loan as of the date of closing.  It follows that even under the debtor's most optimistic scenario (and assuming that one disregards the debtor's claims against PNC that would be a setoff against PNC's claim), PNC has established that there is no equity in the property.

B

If there is no equity in the property (which is the case if one disregards any claim against PNC that might reduce the amount owed to PNC), the debtor has not shown that the Congress Street property is necessary for an effective reorganization.  The case has been pending for more than eleven months.  During that period, the debtor filed a plan on July 23, 2012, but the debtor now views that plan as non-operative, and the plan was not accompanied by a disclosure statement.  The debtor has not filed a new plan.  Nor has the debtor filed a motion to approve the sale to Lester.

If the debtor filed a plan under which the sale of the property to Lester would occur only incident to the approval of the plan, then under 11 U.S.C. § 1146(a) the sale might be made without being subject to the District of Columbia's transfer and

recordation taxes.[5]  Even if the sale were approved under such a
plan (with the sale being exempt from transfer and recordation
taxes), the debtor has not shown that upon paying PNC's
attorneys' fees as part of its claim, and paying a reasonable
settlement fee, the net sales proceeds would be sufficient to pay
the balance of PNC's claim in full.  The debtor has not pointed
to any other source for funding a plan.

A property is "necessary to an effective reorganization"
within the meaning of § 362(d)(2)(B) if "the property is
essential for an effective reorganization *that is in prospect*.
This means . . . that there must be 'a reasonable possibility of
a successful reorganization within a reasonable time.'"  *United
Sav. Ass'n Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484
U.S. 365, 375-76 (1988) (emphasis in original) (quoting *In re
Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 370-71 & nn.
12-13 (5th Cir. 1987) (en banc)).  The debtor points to nothing
other than its attempt to sell the property to Lester, and its
claims against PNC as a basis for formulating a plan.  Putting

---

[5]  PNC's burden to show that there is no equity in the
property was satisfied even if the real estate transfer and
recordation taxes that would ordinarily be due upon a sale are
disregarded.  Moreover, it is not PNC's burden to show that the
debtor cannot achieve a reorganization pursuant to which real
estate transfer and recordation taxes would be eliminated.
Instead, it is the debtor's burden to show that an effective
reorganization can be achieved, including showing the effect of
any plan that resulted in transfer and recordation taxes being
eliminated.

aside the debtor's claims against PNC, the debtor has not shown
that there is a reasonable possibility that a sale to Lester
could result in a confirmable plan within a reasonable time.
Accordingly, putting aside the debtor's claims against PNC, the
Congress Street property is not necessary for an effective
reorganization.

C

To recapitulate, if one disregards the debtor's claims
against PNC, there is no equity in the property and it is not
necessary for an effective reorganization.  Accordingly, relief
from the automatic stay is appropriate under § 362(d)(2) unless a
different outcome is dictated based on the debtor's claims
against PNC.

III

One of the debtor's asserted claims against PNC (or at least
a claim that the debtor's evidence suggested it would assert
against PNC) can readily be dismissed as being without merit.
One of the debtor's members testified that part of the delay in
the debtor's completing construction of the Congress Street
property can be attributed to PNC's refusal to lend the debtor
funds to acquire an adjacent property, an empty lot, located at
220 L Street, N.E.  The debtor originally approached PNC to
obtain financing for the acquisition of both the Congress Street
property and the adjacent L Street property, which the debtor

10

planned to develop together as a joint project.  Based on an
appraisal of the L Street property that PNC now believes
understated the value of the L Street property, PNC declined to
lend funds for the L Street property and was only willing to lend
funds for the Congress Street property.  The debtor nevertheless
entered into the lending agreement with PNC for financing
relating only to the Congress Street property.

To acquire the L Street Property, the debtor's members
elected to form a separate entity (Pad L78, LLC) that, at least
one month later, entered into an agreement with another lender to
finance Pad L78's acquisition of the L Street property.  The
debtor attributes the delay in its acquiring the L Street
property to PNC based on PNC's having obtained a faulty
appraisal, and views that delay as responsible for the delays in
completing construction of the two properties.  The debtor may be
correct that the development of the Congress Street and L Street
properties as a joint project would have been completed on
schedule had PNC funded the acquisition of both properties, but
the fact remains that PNC declined to fund the acquisition of the
L Street property, and if the debtor could not meet the deadlines
it agreed to in the Building Loan Agreement absent financing by
PNC for the acquisition of both properties, the debtor should not
have entered into that agreement.  In short, the debtor's delays
are not PNC's fault, and any claim predicated on the debtor's

11

assertion that PNC is legally responsible for those delays will almost certainly fail for lack of causation.

IV

That leaves the debtor's claim that PNC wrongfully failed to honor the debtor's ninth draw request, and its effect on whether relief from the stay is appropriate under § 362(d)(2).  That claim is not readily dismissed out of hand.  The initial question is whether the court may take that claim into account in deciding whether there is equity in the property and in deciding whether the property is necessary for an effective reorganization.

PNC argues that the debtor's claim for breach of contract may not be considered in the adjudication of PNC's motion for relief from the automatic stay, and must be brought instead as an adversary proceeding.  The court agrees that the debtor's claims against PNC cannot be the subject of a binding adjudication when raised as a defense in a lift stay proceeding.  *BHI Int'l, Inc. v. Horizon Hill Jefferson Condominium, LLC (In re BHI Int'l, Inc.),* 2012 WL 2501034 (Bankr. D.D.C. June 28, 2012).  Beyond that, however, the case law is not entirely clear regarding whether the court should nevertheless take a debtor's counterclaims against the creditor into account in addressing a § 362(d)(2) motion.

An early example of a case addressing this issue is *Citizens & So. Nat'l Bank v. Ga. Steel, Inc. (In re Georgia Steel, Inc.),*

19 B.R. 523 (Bankr. M.D. Ga. 1982). There, the debtor sought to

assert a counterclaim based on the creditor's failure to release

certain collateral, thereby preventing the debtor from acquiring

an alternate source of financing for its business operations. 19

B.R. at 525-26. The court declined to consider the counterclaim:

> The Defendant's couterclaim directs itself to collateral
> matters which, if found to be valid, could result in a
> setoff of the Plaintiff's claim. Affirmative actions or
> counterclaims such as these, which are not directly
> related to the specific debt which serves as the basis
> for the request for relief, are not appropriate for
> consideration in an action for relief from the automatic
> stay.

19 B.R. at 526. The court did this despite quoting legislative

history in which it was stated that:

> [although counterclaims against the creditor] will be the
> subject of more complete proceedings by the trustee to
> recover property of the estate or to object to the
> allowance of a claim . . ., this would not preclude the
> party seeking continuance of the stay from presenting
> evidence on the existence of claims which the court may
> consider in exercising its discretion. What is precluded
> is a determination of such collateral claims on the
> merits at the hearing.

19 B.R. at 524 (quoting S. Rep. No. 95-989, 95th Cong., 2d Sess.

55 (1978), U.S. Code & Admin. News 1978, pp. 5787, 5841.

Some decisions hold that consideration of a debtor's

counterclaim in a lift stay proceeding is appropriate if the

counterclaim "directly" relates to the amount of the creditor's

claim, but is inappropriate if the counterclaim only "indirectly"

relates to the amount of the creditor's claim by way of being a

potential setoff against the claim. *See*, *e.g* ., *In re Franklin*

*Equip. Co.*, 416 B.R. 483, 504-05 (Bankr. E.D. Va. 2009)

(canvassing decisions).  The court in *Franklin Equipment* relied

principally on *United Companies Financial Corp. v. Brantley*, 6

B.R. 178 (Bankr. N.D. Fla. 1980), in which the court stated:

> Although defenses or counterclaims may be related or, to
> an extent, be plausibly relevant to any determination of
> the amount of debt due if they are based upon allegations
> such as misapplication or wrongful receipt of funds,
> breach of contract or various miscellaneous alleged
> contractual duties, or fraud or false representations,
> they are related or relevant only in the sense that, if
> successfully maintained, they would ultimately effectuate
> a reduction or set-off in the overall debt-credit
> relationship between the parties.  These type of matters
> and claims really do not go to the validity and amount of
> the specific debt or lien itself.

6 B.R. at 182.  The debtor's claims here are plainly indirect

claims that, under *Franklin Equipment*, *Brantley*, and similar

decisions, ought not be considered in lift stay litigation.

One decision*, In re Tally Well Serv., Inc.*, 45 B.R. 149,

152-53 (Bankr. E.D. Mich. 1984), initially observed that:

> it is clear that a court is not limited to matters
> strictly relating to the estate's equity, but may
> consider matters generally relevant in deciding whether
> to grant or continue injunctive relief.  The existence of
> other related disputes between the parties may be such an
> equitable consideration, especially when it may have a
> bearing on the debtor's equity, or lack thereof, in the
> assets in question.

There, the court denied relief from the automatic stay based on

the trustee's pending adversary proceeding seeking to avoid the

creditor's lien as a fraudulent conveyance.  For purposes of

deciding whether *Tally Well Service* supports the debtor's

14

position here, however, two points must be emphasized.  First, in examining case law, *Tally Well Service* noted that the unavailability of bankruptcy avoidance claims as a basis for defeating foreclosure in a state court proceeding would weigh in favor of denying relief from the automatic stay.  Second, the court viewed the counterclaim as going beyond seeking to assert a setoff, stating:

> In the event these claims are successful, they are more than mere set-offs or reductions in credit; they would extinguish S & G's status and rights as a secured creditor, and in fact would require S & G to reimburse the estate. These claims are thus the sort that "strike at the heart" of the creditor's lien. *Brantley, supra*, 6 B.R. at 188.

45 B.R. at 153.  Accordingly, *Tally Well Service*, seems, like other decisions, to view litigation that merely would give rise to a setoff, as not appropriate for consideration in the lift stay proceeding.  Moreover, the debtor's claims here are state law claims that will be available in or out of this bankruptcy case.

In *Resolution Trust Corp. v. Shehu (In re Shehu)*, 128 B.R. 26, 29 (Bankr. D. Conn. 1991), in contrast to decisions taking a more restrictive view regarding the consideration of a debtor's counterclaims in lift stay litigation, the court stated:

> Taking their cue from the statement contained in the legislative history, *supra*, that "the party seeking continuance of the stay [is not precluded] from presenting evidence on the existence of claims which the court may consider in exercising its discretion," most courts conclude that evidence of indirect defenses going

15

> to offset the amount of the secured debt is admissible.
> The indirect defenses are not, unless by agreement of the
> parties, subjected to a full-scale trial on the merits.
> The issue is limited to whether the debtor has presented
> sufficient evidence of the bona fides of their claim for
> the court to deny the motion for relief from stay.

[Footnote omitted.]  That approach was appropriately criticized

in *Grand Traverse Dev. Co. L.P. v. Board of Trustees (In re Grand*

*Traverse Dev. Co. L.P.)*, 150 B.R. 176, 184–85, 190–91 (Bankr.

W.D. Mich. 1993).  There, the court ruled that, in deciding

whether to consider an indirect defense, primary consideration

must be given to the purpose of the automatic stay.  *Id.* (lifting

the stay after concluding that adjudication of the merits of the

debtor's claims against the creditor as part of the lift stay

proceedings would not further the policies of the automatic

stay).[6]

I will assume in the debtor's favor, without the necessity

of deciding, that the approach of *Grand Traverse*, instead of the

"direct" versus "indirect" test, is the appropriate one to follow

here, as the result would not differ.  The difficulty with the

---

[6]  As quoted in *Grand Traverse*, 150 B.R. at 189, the
legislative history, found at S. Rep. No. 989, 95th Cong., 2nd
Sess. 54-55, reprinted in 1978 U.S. Code Cong. & Admin. News
5787, 2840-41, describes the purpose of the automatic stay as:

> [o]ne of the fundamental debtor protections provided by
> the bankruptcy laws.  It gives the debtor a breathing
> spell from his creditors.  It stops all collection
> efforts, all harassment, and all foreclosure actions.  It
> permits the debtor to attempt a repayment or
> reorganization plan, or simply to be relieved of the
> financial pressures that drove him into bankruptcy.

"direct" versus "indirect" counterclaims test is that it leaves a lot of leeway for the court to decide what is a counterclaim that goes directly to the rights of the creditor.  For example, equitable subordination is a counterclaim that courts have treated as one that ought to be considered in hearing a lift stay motion.  *See In re Poughkeepsie Hotel Assocs. Joint Venture*, 132 B.R. 287, 292 (Bankr. S.D.N.Y. 1991).  It is easy to imagine that the debtor here could recast its counterclaim as one for equitable subordination.

Assuming that it may be appropriate in some circumstances to consider indirect defenses in the exercise of the court's discretion, and following the approach of *Grand Traverse*, this is not an appropriate case to exercise such discretion in favor of the debtor.  In the context of this case, the primary purpose of the automatic stay is to preserve any equity in the property and to give the debtor breathing room within which to seek to reorganize.  The debtor commenced this bankruptcy case eleven months ago but has failed to go forward with any plan towards confirmation.  The debtor's exclusive period within which to file a plan has expired.  The debtor has yet to obtain a sales contract that would pay the full amount of PNC's claim.  The debtor has not objected to PNC's claim or filed an adversary proceeding to seek a recovery from PNC based on the claim that PNC damaged the debtor by failing to honor its ninth draw

17

request.   The debtor has had sufficient breathing space within
which to arrive at a consensual plan or to initiate plenary
litigation to address how much is owed to PNC based on the
setoffs the debtor seeks to assert.

Moreover, even when the court attempts to consider a
debtor's counterclaim in addressing a lift stay motion, the court
should apply preliminary injunction standards in deciding whether
the circumstances warrant keeping the automatic stay in place
based on the possible merits of the counterclaim.   The debtor's
evidence failed to reach the level that would make preliminary
injunctive relief appropriate.

First, without an objection to claim or an adversary
proceeding having been filed, the issues regarding the debtor's
asserted right of setoff have not been framed with clarity.
Indeed, unlike a preliminary injunction motion, the debtor's
opposition to PNC's motion gave only the sketchiest of a

suggestion of the claim it would pursue.[7]  The debtor submitted
no brief on the legal issues surrounding the debtor's claim
against PNC.  The issues are complex ones of fact and law.

In addition, the debtor's evidence did not show a
probability of success on the merits of its claim.  One of the
debtor's members testified about making the ninth draw request in
July 2009, but the debtor neglected to produce the actual request
that was made then.  Without that request in evidence, it is
impossible to determine whether the request was in proper form as
required by the terms of the Building Loan Agreement.  The debtor
showed that PNC had waived any requirement of submission of
previous draw requests in the form required by PNC for the ninth
draw request.  Nevertheless, the debtor has failed to convince me

_____

[7]  The debtor's response to the motion for relief from the
automatic stay merely recited:

### AFFIRMATIVE DEFENSES

34. Any allegations of Movant's Motion that have not
been explicitly admitted and that require a response from
the Respondent are hereby denied.

35. Movant's Motion is barred by the equitable
principles of laches, estoppel and unclean hands.

36. Movant's Motion is barred by the doctrines of
waiver and fraud.

37. Movant's Motion is barred by its own breach of
contract, which caused the alleged default which it
attributes to the Debtor.

that there is a probability that it would eventually demonstrate
that PNC was wrong in insisting that the ninth draw request be
submitted in proper form.  The debtor acquiesced in submitting
the request on Sunday August 30, 2009, in a format acceptable to
PNC.  That was only one day before the Completion Date of August
31, 2009.  Building Loan Agreement § 1.1.  PNC requested an
inspector's report on Monday August 31, 2009, an item it was
entitled to have in hand before acting on the draw request, and
there is no evidence that PNC unreasonably delayed requesting
that report.  The inspector submitted a preliminary report on
September 4, 2009, and estimated that a final report would be
completed on September 16, 2009.  As of September 1, 2009, the
debtor's failure to complete construction by the Completion Date
was a breach by the debtor of an affirmative covenant.  Building
Loan Agreement § 6.3.  As of September 16, 2009, the breach of
the covenant to complete construction by August 31, 2009, had
continued unremedied for 15 days, and thus constituted an Event
of Default.  Building Loan Agreement § 8.1(c).  Based on that
Event of Default, PNC was entitled to decline to make any further
advances as of September 16, 2009.  Building Loan Agreement
§ 8.2(a).

Whether PNC was entitled to decline to honor the draw
request because it was obvious that the debtor would not be able
to prevent an Event of Default from arising on September 16,

2009, is one that the parties have not briefed.  Even if PNC

ought to have honored the ninth draw request prior to September

16, 2009, an honoring of the draw request would not have enabled

the debtor to complete construction in order to avoid there being

an Event of Default in place as of September 16, 2009, that would

have justified PNC's proceeding to foreclosure.  As of the second

inspector's report of September 23, 2009, the debtor did not have

in hand building permits for the construction work that remained

to be done other than demolition, foundation and structural

framing.  Accordingly, it is apparent that PNC's failure to honor

the ninth draw request prior to September 16, 2009, did not

interfere with the debtor's completion of construction by

September 16, 2009, such that the debtor could have otherwise

prevented an Event of Default from arising.  In any event, taking

into account the additional debt the debtor would have incurred,

and the amount of additional construction that could have

realistically been performed with the limited funds sought by the

debtor's ninth draw request, it is highly speculative whether the

ninth draw request, had it been honored, would have increased the

value of the property sufficiently to give rise to the debtor's

having equity in the property.[8]  Nor did the debtor make a

showing of a probability that the ninth draw request (if honored)

would have enabled the debtor to obtain financing elsewhere in

order to complete construction.

Finally, the debtor's claim against PNC, if meritorious,

will eventually result in a monetary judgment, and any damages

can include any loss arising from PNC having foreclosed on the

property if that is proven to have been caused by PNC's alleged

wrongful failure to honor the ninth draw request.  The court

recognizes that real property is a unique asset that cannot be

replaced, and the unique character of real property is a factor

courts consider in a preliminary injunction analysis under

nonbankruptcy law when evaluating the risk of irreparable harm to

a debtor who seeks to halt a foreclosure sale.[9]  Here, however,

the impact of the uniqueness of the real property, for purposes

of considering the debtor's claims in this expedited lift stay

proceeding, must be evaluated in light of the bankruptcy policies

---

[8]     The ninth draw request of $113,750 was for less than
one-tenth of the remaining draws contemplated by the Building
Loan Agreement.  Completion of the project, on the other hand,
was projected to take six and a half months from the commencement
of demolition work that began in mid-July 2009, so it is fair to
conclude that, as of the date upon which the debtor submitted the
properly formatted ninth draw request, the debtor was not able to
complete the construction by September 16, 2009.

[9]     For reasons previously discussed, the debtor has not
shown a probability of success on the merits such as to warrant
an injunction under nonbankruptcy law even if a foreclosure sale
would constitute irreparable harm.

underlying the automatic stay.  Under the *Grand Traverse*

approach, the court must decide whether keeping the stay in place

is consistent with the bankruptcy policies behind the automatic

stay.  As to such bankruptcy policies, the debtor has raised its

claim against PNC in an attempt to show that there is a right of

setoff that gives rise to there being equity in the property (so

that a sale by the debtor could fetch something for the estate),

and to show that the property is necessary for an effective

reorganization.  The amount of the debtor's claim against PNC is

unaffected by the uniqueness of the property and will remain

intact even if the court allows PNC to proceed to foreclosure.

Accordingly, any loss of equity attributable to any wrongful act

by PNC can be adequately remedied at law.  Even now, eleven

months after the case commenced, no proposed plan is pending, and

the debtor has not shown that one can be confirmed within a

reasonable period of time, so the unique character of the

property similarly does not suffice to show that the property is

necessary for an effective reorganization.

For all of these reasons, I conclude that the debtor's

asserted claim against PNC provides an insufficient basis to

warrant denying relief from the automatic stay under § 362(d)(2).

V

That leaves the issue of whether relief from the automatic

stay is appropriate under § 362(d)(1).  If one disregards the

23

debtor's claims against PNC, the lack of equity results in there
being no equity cushion to protect PNC with respect to the
accrual of real estate taxes on the property.  Because tax liens
are a superior lien on real property, the consequence is that
PNC's lien position is being eroded from above by the accrual of
real estate taxes on the property if there is no equity in the
property.  It follows that if PNC is treated as owed
$3,115,054.34, it is entitled to adequate protection payments as
a condition to the court's not granting relief from the automatic
stay.  PNC's evidence shifted the burden to the debtor to show
that the lien is adequately protected.  *See, e.g., In re Elmira
Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).  The
debtor has failed to make any such showing.  It has not proposed
adequate protection payments and offered no evidence of an
ability to make adequate protection payments.  Nor is a confirmed
plan imminent that would address the issue of adequate
protection.  Accordingly, relief from the automatic stay is
appropriate under § 362(d)(1) unless a different outcome is
dictated based on the debtor's claim against PNC.

Even if there were a likelihood that the debtor's claim
would ultimately be upheld, PNC's secured claim must be protected
by the court until a final non-appealable judgment has been
entered in favor of the debtor on its claim in a separate
adversary proceeding (or in a contested matter adjudicating an

24

objection to PNC's proof of claim). *Hoyt, Inc. v. Born (In re Born)*, 10 B.R. 43, (Bankr. S.D. Tex. 1981). The evidence establishes that, without any claim of the debtor having been adjudicated to reduce PNC's lien claim, there is no equity in the property. It follows that PNC has shown at this juncture that its lien is not adequately protected against the erosion of its lien from above by way of the continuing accrual of taxes against the property that will enjoy a superior lien position. The debtor's assertion of a claim against PNC, presenting complex questions of damages and contract law, cannot appropriately be considered as demonstrating that there is no need for adequate protection payments when that claim cannot reasonably be fully tried to a final judgment in another proceeding within the 60-day deadline set by § 362(e)(2) for adjudicating this lift stay proceeding. *In re Born*, 10 B.R. at 47-48. *See also Lincoln Bank v. High Sky, Inc. (In re High Sky, Inc.)*, 15 B.R. 332 (Bankr. M.D. Pa. 1981).

Accordingly, relief from the stay is appropriate under § 362(d)(1) despite the debtor's claims against PNC.

VI

An order follows granting relief from the automatic stay to permit PNC to proceed with foreclosure.

[Signed and dated above.]

Copies to: Debtor; recipients of e-notification.